The opinion was delivered at the September term, 1851.
Dewey, J.
The questions arising in the present case, as to the validity of the license to the administrator, to sell the real estate of the intestate, have been substantially decided in the case of Yeomans v. Brown, 8 Met. 51. The construction there given to the Rev. Sts. c. 71, § 8, was, that a license in the general form here used was a valid license, and that it was not absolutely requisite, that the specific portion of the estate to be sold should be designated, either in the petition, or in the order for sale. The provisions are general, applying to all cases oí applications to sell real estate for the payment of debts ; and although we can perceive many benefits, that would result from a more specific designation of the particular *528 land to be sold, and a special order for the sale of a specific part, especially in cases where it is proposed to sell land in the possession of one claiming adversely, the decision of this court, in the case already referred to, has settled the construction of the statute. The present case differs from that, in respect to the adverse party, as in this the adverse party claims by deed from the intestate, and there was a public notice given of the application; this seems to be sufficient for the purpose, and all persons interested to prevent such order must act upon the notice. The case of Arnold v. Sabin, 1 Cush. 525, is to the point of the sufficiency of such general notice, in reference to the appointment of an administrator.
Supposing the license to sell the real estate of the intestate duly obtained, the next question is, whether the land demanded in this action is included in the estate liable to be thus sold. By Rev. Sts. c. 71, § 11, the real estate liable to be sold for the payment of debts includes “ all that the deceased may have conveyed, with intent to defraud his creditors.” But in the report of the present case, it is distinctly stated, “ that it was not contended that there was any intent to defraud the creditors of the said Gideon.” Unless the fact, that the conveyance was partly by way of gift, controls the statement in the report, it is difficult to see how this is a case within the provisions of the statute.
Looking at the object of the statute, and the reasonableness of extending the provision for a sale equally to land transferred for some fraudulent purpose, and to land professedly conveyed by one in debt, without any consideration other than love and affection, we should suppose, that both species of conveyance would be liable to be set aside, after the death of the grantor, if the payment of his existing debts required it. The conveyance of property by way of gift, by one deeply in debt, if thereby he becomes incapacitated to pay his debts, is legally fraudulent as to his creditors ; and, if in the present case, such should be found to have been the fact, as to the circumstances attending this conveyance, it may be deemed in law fraudulent, though no such fraudulent intention existed in the mind of the grantor, he not properly considering the amount of his indebtedness, or the extent of his assets.
*529 Taking the case most strongly in favor of creditors, it was only a case of a voluntary conveyance, or a conveyance made without adequate pecuniary consideration ; and such conveyance could not be impeached by subsequent creditors; and the inquiry, whether it can be avoided as fraudulent in law, must be with reference to the debts existing at the time of the conveyance. If his then present debts were not such as to incapacitate the grantor, from giving to his sons that part of the consideration for the conveyance, which was a gift, then the conveyance will be held good and effectual. The law Joes not forbid the conveying of property by way of gift, when one has adequate means left to pay his debts.
The conveyance of February 6th, 1846, being founded partly upon a gift, its validity will depend upon the state of the assets of the intestate and the amount of his debts, at that period. The auditor has reported the whole amount of the indebtedness of Gideon Canfield, at that date, to be §2,754.35. If the joint and several notes composing a part of this sum, and of the amount of §970.77 were debts of Gideon Canfield alone, and the other joint promisor is a mere surety, then the sum first named is to be taken to be the true amount of indebtedness of said Gideon. If on the other hand, the sum of .§970.77, or any part thereof, was really a joint debt as between the copromisors, then to the amount of such joint indebtedness, one half thereof is to be deducted from the sum of §2,754.35, and the balance is to be taken as the amount of the debts of Gideon Canfield on the 6th of February, 1846.
The next inquiry will be, what was the amount of the assets 1 The report says, that “ evidence was offered tending to show that the assets of said Gideon at the time of the conveyance, besides the farm, amounted to §2800.” But that question has not been passed upon or found by the jury, and the case must be submitted to a jury, upon that point, unless the facts should be agreed by the parties. If the result shows obviously a sufficiency of assets to pay the debts, and to make the gift to the extent it was made, the conveyance was a valid one. If otherwise, then it was fraudulent, as respects the then existing creditors.
*530 It has already been stated, that it is only the then existing creditors, that could have avoided this conveyance, if the grantor had been still living. This presents another difficulty in the case. The then existing debts, upon the decease of the grantor, were allowed by the same commissioners, and paid out of the same common fund, as the debts subsequently contracted. The pro rata distribution, if an estate is insolvent, is the same for each. It is therefore impracticable to carry out the principle of subjecting the land conveyed by Gideon Canfield to be sold for the payment of preexisting debts exclusively, unless we adopt the principle of having a division of the assets into two classes. This we think is not to be allowed here; and we are of opinion, that though the ground of avoiding this conveyance is, that the land was liable to be taken to satisfy existing creditors only, yet when the conveyance is avoided, the proceeds of the sale will be assets generally, and other creditors will receive the benefit thereof incidentally.
The farther questions are, first, as to the effect of the receipt of payment, by the administrator, of the notes, given for the purchase-money of the land. This, it is contended by the defendant, was a ratification, by the administrator, of the sale. If this payment had been received with full knowledge of all the facts, and if the administrator was a party in interest like the heirs at law, such might be the effect; but we apprehend no such consequences will follow, in the present case, from the receipt of payment of the notes by the administrator. Equity will of course require, that in some mode the party paying the money shall be reimbursed or receive an equivalent, inasmuch as there was no moral fraud, and the contract has failed for causes not anticipated by the original parties. As the sum thus paid has been or must be applied by the administrator to the payment of the debts of the grantor, this will lessen, to the entire extent of the sum thus paid, the amount for which the land may be sold to pay debts ; and in this way the parties who have paid the money may be benefited to the amount which they have paid.
Another question relates to the debt allowed by the commissioners to Theron Canfield. It is argued, that inasmuch *531 as he was one of the grantees under the deed, and has acted upon it and made partition with the other grantee, under whose title the defendant claims the land, Theron Canfield ought now to be estopped to set up the objection that this deed was fraudulent. This might be so, if he was the sole creditor. But this is not the case, and his claim is already allowed by the commissioners, is legally chargeable on the assets, and will be entitled to a pro rata dividend. The rights of other creditors, therefore, seem to require, that the debt to Theron Canfield should be computed as one of the debts for which the land is to be sold.
A further question has been considered by us, which bears materially upon the effect of the decision, that the administrator may maintain this action, if the state of the debts and the assets on the 6th of February, 1846, should establish this deed to have been legally fraudulent as to the creditors, namely, the effect of a recovery by the plaintiff in this action. And upon that point, the court are of opinion, that under the general order, to sell so much land as will raise the sum of $1,200, to pay the debts of the intestate, if the administrator brings his action to recover the real estate of the deceased, the effect of a judgment in his favor will be only to vest in him so much of the land, as may be required to be sold to raise the necessary sum to pay the debts, as stated in his order; and that the object of the recovery being thus accomplished, the estate remaining will be the estate of the defendant. The court will order a qualified judgment in such cases, reciting the order of sale and limiting the title to be acquired under the judgment to so much of the real estate described in the writ, as shall be required to be sold at public auction, to raise the sum stated in the order of the probate court. This qualified judgment, of course, will only be applicable to cases, where the transaction is not tainted with actual fraud, and where the conveyance is not made with the intent to delay creditors.